**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on March 28, 2007)
BID PROTEST

AGREED-UPON REDACTED COPY – MAY BE MADE PUBLIC APRIL 4, 2007

BANNUM, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant,

and

DISMAS CHARITIES, INC.,

Defendant-Intervenor.

No. 07-109C
Judge Allegra

**DISMAS CHARITIES, INC.'S REPLY IN SUPPORT OF ITS**
**<u>CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD</u>**

Alex D. Tomaszczuk
PILLSBURY WINTHROP
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102
Tel: (703) 770-7940
Fax: (703) 770-7901

*Counsel of Record for Plaintiff*
*Dismas Charities, Inc.*

*Of Counsel:*

Daniel S. Herzfeld
Orest J. Jowyk
PILLSBURY WINTHROP
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102
Tel: (703) 770-7900

Dated: March 28, 2007

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... iii

I. BOP PROVIDED MORE THAN REASONABLE TIME TO BANNUM FOR DISCUSSIONS ..... 2

A. Bannum [redacted] BOP Was Justified In Eliminating Bannum From The Competitive Range Without Further Discussions ..... 3

B. BOP's Corrective Action Was Not Based On Any Admitted Errors That Created Any Competitive Disadvantage ..... 5

II. THE PRIVATE COVENANT DOES NOT PROHIBIT DISMAS FROM OPERATING A COMMUNITY CORRECTIONS CENTER ..... 8

III. BANNUM FAILED TO ADDRESS THE BAD FAITH STANDARD ..... 11

IV. BANNUM HAS FAILED TO SHOW THAT IT SHOULD BE AWARDED INJUNCTIVE RELIEF ..... 12

A. Bannum Will Suffer No Irreparable Harm Should The Court Not Remand This Case ..... 13

B. The Balance Of Hardships Favors Dismas And BOP ..... 14

C. Injunctive Relief Will Not Serve The Public's Interest ..... 15

CONCLUSION AND RELIEF REQUESTED ..... 16

## TABLE OF AUTHORITIES

Cases

*Beta Analytics Int'l v. United States*,
69 Fed. Cl. 431 (2005) .......... 6

*Ellsworth Assocs., Inc. v. United States*,
45 Fed. Cl. 388 (1999) .......... 15

*Filtration Dev. Co., LLC v. United States*,
60 Fed. Cl. 371 (2004) .......... 13

*Galen Medical Assocs., Inc. v. United States*,
369 F.3d 1324 (Fed. Cir. 2004) .......... 11, 12

*Hosp. Klean of Texas, Inc. v. United States*,
65 Fed. Cl. 618 (2005) .......... 13

*Info. Sciences Corp. v. United States*,
73 Fed. Cl. 70 (2006) .......... 14, 15

*L.P. Consulting Group, Inc. v. United States*,
66 Fed. Cl. 238 (2005) .......... 11

*Marco Island Civic Ass'n, Inc. v. Mazzini*,
881 So. 2d 99 (Fla. 2nd Dist. Ct. App. 2004) .......... 9, 10

*Norfolk Dredging Co., Inc. v. United States*,
58 Fed. Cl. 167 (2003) .......... 13

*PGBA, LLC v. United States*,
389 F.3d 1219 (Fed. Cir. 2004) .......... 13, 14, 15

*Seattle Sec. Services, Inc. v. United States*,
45 Fed. Cl. 560 (2001) .......... 6, 13

*Textron Inc. v. United States*,
74 Fed. Cl. 11 (2006) .......... 6

*United Int'l Investigative Services, Inc. v. United States*,
41 Fed. Cl. 312 (1998) .......... 13, 14

*Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n*,
758 F.2d 669 (D.C. Cir. 1985) .......... 13

Comptroller General Decisions

*Computer Sciences Corp.*,
B-190632, 79-2 CPD ¶ 102 .......... 6

*Ford Aerospace Corp.*,
B-239676, 91-1 CPD ¶ 260 .......... 6

*Kaufman Lasman Associates, Inc.*,
B-229917, 88-2 CPD ¶ 381 .......... 6

*Keeton Corrections, Inc.*,
B-293348, 2005 CPD ¶ 44 .......... 3

*Smith & Wesson*,
B-232681.2, B-232681.3, 89-1 CPD ¶ 134 .......... 6

Statutes and Regulations

28 U.S.C. § 2503 .......... 11, 12

48 C.F.R. § 15.306 .......... 5

48 C.F.R. § 15.307 .......... 5

Rules of the United States Court of Federal Claims

Rule 52.1 .......... 1

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on March 28, 2007)
BID PROTEST

| | | |
|---|---|---|
| BANNUM, INC., Plaintiff, v. THE UNITED STATES, Defendant, and DISMAS CHARITIES, INC., Defendant-Intervenor. | ) | AGREED-UPON REDACTED COPY – MAY BE MADE PUBLIC APRIL 4, 2007<br><br>No. 07-109C<br>Judge Allegra |

**DISMAS CHARITIES, INC.'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Pursuant to RCFC 52.1 and the Court's Scheduling Order dated February 20, 2007, Defendant-Intervenor Dismas Charities, Inc. ("Dismas") replies to Plaintiff Bannum, Inc.'s ("Bannum") Reply Brief ("Bannum's Reply"). Bannum's Reply fails to disprove what the Administrative Record ("AR") conclusively shows, which is that the Defendant, acting through the Department of Justice ("DOJ') Federal Bureau of Prisons ("BOP"), in the course of taking voluntary corrective action, acted properly, legally, and within its discretion by eliminating Bannum from the competition for award of Contract No. DJB200824 under Request for Proposals No. 200-0880-SC ("RFP" or the "Solicitation"). First, BOP provided more than enough opportunities and time for discussions to Bannum [redacted] which Bannum, in the course of [redacted] during this procurement, has *still failed* to accomplish. The alleged inequalities in the discussions, if

any, were all in Bannum's favor. Second, Dismas's proposed site location is both properly zoned for use as a Community Corrections Center ("CCC"), and such use is squarely within the permitted uses of the site under a private covenant with the local property owners association. Finally, Bannum failed even to address the issue of the standard of review for its accusations of "bad faith" on the part of BOP, much less provide the "well-nigh irrefragable proof" required to support such accusations. For all of these reasons, judgment on the AR should be entered in favor of Defendant and Dismas.

## I. BOP PROVIDED MORE THAN REASONABLE TIME TO BANNUM FOR DISCUSSIONS

Bannum first contends that BOP did not give Bannum enough time during the discussions for Bannum to [redacted] The AR shows, however, that BOP provided sufficient time for all offerors to respond to BOP's two Discussion Notices. Two offerors, [redacted], and Dismas, despite the obstacles presented by the extended time between the issuance of the RFP and the discussions, [redacted] The fault for Bannum's failure to do so lies not with BOP, but with Bannum.

Bannum itself admits that its responses to Discussion Notice #2 were non-compliant with the RFP. Bannum's Reply at 1 ("Bannum does not contend that [redacted] revisions submitted on January 26, 2007 met all RFP requirements."). Rather, Bannum premises its argument on the false notion that these underlying discussions were designed to "remedy prejudicial BOP procurement errors." *Id.* (emphasis in original). Bannum then weaves together a web of insinuations, suppositions, and unsupported claims in an attempt to contend that the time provided by BOP for discussions was inadequate.

### A. Bannum Never P[redacted] And BOP Was Justified In Eliminating Bannum From The Competitive Range Without Further Discussions

The AR clearly shows that Bannum has never [redacted] in compliance with the requirements of the Solicitation. Bannum fails to rebut this contention. Instead, Bannum offers excuses for why it did not or would not provide the proper documentation.

Bannum offers only a tepid response to explain how [redacted] noting only that it "discovered after BOP's remedial action [redacted] . . . ." Bannum's Reply at 2. This "discovery" forms the primary cause of Bannum's failure to [redacted], yet, Bannum fails to explain [redacted] One answer, however, is Bannum's [redacted] Such risks, however, are not only not the contracting agency's fault, they can properly be taken into account by a contracting agency during an evaluation. *See Keeton Corrections, Inc.*, B-293348, 2005 CPD ¶ 44, at 11 (although "building ownership was not identified in the RFP as an evaluation factor," the contracting agency "could reasonably credit Dismas with ownership of its facility in the evaluation"). Bannum's [redacted] is Bannum's responsibility, not BOP's.[1]

---

[1] In constructing this argument, Bannum asserts that "BOP was well aware that . . . [redacted] is typical in this industry." Bannum's Reply at 7. Bannum provides no evidence or data of any sort to back up this claim regarding the "industry." [redacted] during the pendency of the various protest actions in this procurement, which Bannum itself initiated.

Moreover, Bannum offers no supportable reason for its decision, *inter alia*, [redacted] In this regard, Bannum states that [redacted]. Bannum's Reply at 5; AR 4423. Bannum blames this state of affairs on BOP's failure to provide an [redacted] Bannum's Reply at 2. However, none of the offerors were provided [redacted] The risk of [redacted] was common to all of the offerors. Ultimately, Bannum apparently made a business decision [redacted] even though it had to know such a business decision would [redacted]

Bannum's latest brief also contradicts its assertion that [redacted] was "timely submitted" and that it was allowed to submit and complete [redacted] Bannum's Reply at 6. By its own admission, Bannum failed to comply with the RFP by not including all of the [redacted] Bannum's Reply at 1. Bannum provided [redacted] until after the response date for Discussion Notice #2 had passed. Bannum's Reply at 5. Bannum provided [redacted] *Id.* Apparently, Bannum believed that it, alone among offerors, could wait until FPRs to submit all of the required documentation.

BOP has given Bannum every opportunity, and then some, [redacted] submit the required documentation. Bannum simply did not comply, just as it has been unable to provide a site in a timely manner throughout this procurement (always requesting just a little additional

time to comply with the Solicitation). Bannum was entitled neither to continue in the competition nor to any more favorable treatment, such as further discussions, than it already received from BOP.

Bannum's failure to comply with key Solicitation requirements fully justified its elimination from the competitive range, and in turn excluded it from any "entitlement" to submit an FPR. "At the conclusion of discussions, each offeror still in the competitive range shall be given an opportunity to submit a final proposal revision." 48 C.F.R. § 15.307(b) (emphasis added); *see also id.* § 15.306(d)(5). Ultimately, based on Bannum's own business misjudgments [redacted], BOP properly eliminated Bannum's non-compliant proposal. Bannum was no longer in the competitive range and, therefore, it had no "right" to submit an FPR.

**B. BOP's Corrective Action Was Not Based On Any Admitted Errors That Created Any Competitive Disadvantage**

In proposing voluntary corrective action, BOP never admitted to any procurement errors, much less any prejudicial errors. BOP specifically stated that it "in no way admits or concedes the validity of any of the allegations, factual assertions, or alleged errors contained in Bannum's various pleadings." AR 4058. The reason BOP proposed the voluntary corrective action was because the AR "is ambiguous whether Dismas, or any of the other offerors, provided an appropriate critical path diagram." AR 4057 (emphasis added). Bannum simply assumes that its initial proposal complied with the critical path diagram requirement while Dismas's did not, an assumption neither shared by BOP nor supported in the record.[2] In fact, both Dismas and

---

[2] Bannum's assertion that the Source Selection Evaluation Board ("SSEB") "again" found Dismas's initial offer deficient and Bannum's initial offer compliant (Bannum's Reply at 9) is patently incorrect. In fact, the SSEB found that none of the offerors' initial proposals,

Bannum initially submitted similar narrative descriptions that fulfilled the requirement for a critical path diagram. *Compare* AR 751-54 *with* AR 957-60. BOP initially fully accepted only Bannum's submission. Had BOP downgraded Dismas's proposal for this alleged "deficiency," BOP would have treated Dismas unequally vis-à-vis Bannum. *See Seattle Sec. Services, Inc. v. United States*, 45 Fed. Cl. 560, 569 (2001) ("[I]t is fundamental that the contracting agency must treat all offerors equally; it must evaluate offers evenhandedly against common requirements and evaluation criteria.") (citation and quotation omitted).

Furthermore, contrary to Bannum's assertions, BOP was not required to mitigate any supposed competitive advantage. The requirement to mitigate a competitive advantage arises only where an agency has been found to have erred, and does not arise where a protester was disadvantaged through its own actions. *Beta Analytics Int'l v. United States*, 69 Fed. Cl. 431, 434 (2005); *Textron, Inc. v. United States*, 74 Fed. Cl. 11, 26 (2006); *Ford Aerospace Corp.*, B-239676, 91-1 CPD ¶ 260, at 3; *Smith & Wesson*, B-232681.2, B-232681.3, 89-1 CPD ¶ 134, at 8-10; *Kaufman Lasman Associates, Inc.*, B-229917, 88-2 CPD ¶ 381, at 4; *Computer Sciences Corp.*, B-190632, 79-2 CPD ¶ 102, at 8-10.[3] Unlike the cases and decisions where an agency error disadvantaged a protester, here, there was no agency error and the protester disadvantaged itself.

---

including Bannum's, complied with the requirements of Amendment No. 0004 to the RFP, which changed the requirement for a critical path diagram. AR 4221.

[3] Bannum's Reply is tellingly silent on just how "Defendants [*sic*] attempt to distinguish the [Government Accountability Office ("GAO")] cases also fail [*sic*]." Bannum's Reply at 10. In each of the GAO decisions, a finding of agency error is a prerequisite to a finding that the agency was required to mitigate a competitive advantage. See *Ford Aerospace Corp.*, B-239676, 91-1 CPD ¶ 260; *Smith & Wesson*, B-232681.2, B-232681.3, 89-1 CPD ¶ 134; *Kaufman Lasman Associates, Inc.*, B-229917, 88-2 CPD ¶ 381; *Computer Sciences Corp.*, B-190632, 79-2 CPD ¶ 102. Here, the agency has not been found to have erred, and therefore Bannum cannot distinguish the GAO decisions.

BOP took voluntary corrective action not to correct any alleged errors, but rather to clarify an ambiguity concerning the requirement for a critical path diagram. Both Bannum and Dismas submitted similar narrative descriptions to fulfill the critical path diagram requirement. *Compare* AR 751-54 *with* AR 957-60. BOP's Technical Evaluation Panel ("TEP"), meeting on March 28, 2006, initially assigned Dismas a "clarification" regarding the critical path diagram. AR 230.[4] The TEP noted that Bannum and [redacted] had submitted critical path diagrams. AR 211, 239.[5]

The TEP's April 4, 2006 memorandum to the Contracting Officer stated that Dismas needed to clarify its plans for 120-day availability, while [redacted] was deficient for not submitting a critical path diagram. AR 169-73. It is only in draft versions of the TEP memorandum that Dismas appears to have a deficiency. AR 2367, 2378. In both the TEP's Consensus Working Papers, and in the final version of the TEP memorandum, this alleged deficiency was properly labeled a clarification. AR 230, 170.

Because both Bannum and Dismas submitted similar narrative descriptions to fulfill the critical path diagram requirement (*compare* AR 751-54 *with* AR 957-60), a rational evaluation would conclude either that both offerors met the requirement, or that neither offeror met the requirement. Here, there is no evidence of disparate treatment in favor of Dismas; indeed, if

---

[4] Bannum continues to misrepresent the TEP's conclusions concerning Dismas's initial proposal. Bannum's Reply at 8. Bannum states that the TEP "unanimously considered Dismas' offer deficient but found Bannum compliant." *Id.* The AR clearly shows, however, that the TEP did not find Dismas's offer deficient. AR 169-70. BOP merely requested a clarification of Dismas's 120-day availability plan. *Id.*

[5] A fourth offeror, [redacted], was initially assigned a "clarification" by the TEP for not providing a critical path diagram. AR 220. [redacted] proposal contained neither a critical path diagram nor a narrative description similar to those submitted by Bannum and Dismas. AR 1765. BOP properly changed this clarification to a deficiency in the April 4, 2006 TEP memorandum to the Contracting Officer. AR 172.

anything, the record reflects that the evaluators applied a more rigorous standard to Dismas than to Bannum in evaluating their responses to the critical path diagram requirement. Accordingly, Bannum was not entitled to any mitigation. Any disadvantage to Bannum was not the result of improper agency action or inaction, but solely the result of Bannum's own failure to secure and hold a suitable site.

## II. THE PRIVATE COVENANT DOES NOT PROHIBIT DISMAS FROM OPERATING A COMMUNITY CORRECTIONS CENTER

In keeping with its apparent world view that everybody save Bannum is a dishonest scoundrel with nothing better to do than conspire to find ways to harm Bannum, Bannum continues to falsely impugn Dismas's integrity on the issue of a private covenant related to Dismas's proposed site location. Bannum urges that Dismas's response relies on "technical arguments," Bannum's Reply at 13 – also sometimes known as the law and the facts. Bannum once again asserts that its prior protest somehow triggered in BOP a duty to inquire into Dismas's documentation as "materially incomplete" regarding its right to use its facility. Bannum's Reply at 12. Contrary to Bannum's assertions, however, no such inquiry was required. Dismas properly purchased and proposed a facility with the correct zoning – "industrial use" – for a CCC facility, not the "residential" use that Bannum claims. Furthermore, contrary to Bannum's contentions, Dismas was not required to submit the private covenant concerning its facility to BOP because there is no reliable evidence that the Edgewater North Commerce Park Property Owners Association ("ENCPPOA") opposed Dismas's use of the proposed facility as a CCC.

First, Dismas's initial proposal to BOP was materially complete. The RFP did not require, and in fact did not allow, the submission of private covenants as part of the

documentation of a right to use. AR 119. This is not, as Bannum would have it, merely a "technical argument" or a "diversion." Rather, this is the clearly stated requirement of the RFP.

Second, Bannum either knows or should know that, under Orlando zoning regulations, a CCC in Orlando is not a "residential" use but rather an "industrial" use. In Orange County, Florida, where Dismas's proposed facility is located, a CCC is an industrial use, as evidenced by the letter from the Assistant Manager of the Orange County Government Zoning Division (Mr. Tim Boldig) that Dismas submitted in its proposal:

> We have reviewed the operation as described in your inquiry and have determined that the [CCC] activities are consistent with Standard Industrial Classification (SIC) Group #8361 as applied to the Orange County Zoning Regulations.
>
> Users listed in SIC Group #8361 are a permitted use in the following industrial districts: I-1/I-5, I-2/I-3 and I-4.

AR 862 (emphasis added). Dismas's proposed facility, located at 6860 Edgewater Commerce Parkway, Orlando, Florida, is in an I-2/I-3 industrial district. AR 865, 990.

Because a CCC was not a residential use, in applying to and receiving zoning approval for its facility as a permitted industrial use, Dismas obtained and submitted with its proposal the official zoning approval required by the RFP and accepted by BOP. AR 862, 224.

Moreover, an industrial use is precisely what the ENCPPOA covenant specifically allows. AR 1239 ("No lot shall be used except for commercial, warehouse, and industrial purposes . . . .") (emphasis added). This is not a matter of differing interpretations, but a matter of the continuing misrepresentation of a clear fact to this Court on the part of Bannum.

In support of its position, Bannum cites a case that stands for the proposition that local zoning regulations do not control the enforcement of a private restrictive covenant. Bannum's Reply at 13 (citing *Marco Island Civic Ass'n, Inc. v. Mazzini*, 881 So. 2d 99 (Fla. 2nd Dist. Ct.

App. 2004)). This may be true, but completely beside the point. The case cited by Bannum concerned an attempt by a property owner to "void a restrictive covenant . . . that limited the use of the property." *Marco Island*, 881 So. 2d 99 at 102. Here, Dismas did not and does not seek to "void a restrictive covenant." The ENCPPOA covenant limits lot usage to, among other things, "industrial" uses. Operating a CCC facility is an "industrial" use. In operating a CCC facility at its proposed site location, Dismas, in fact, was and is in complete compliance with the private restrictive covenant.

Third, Bannum continues to assert that the ENCPPOA opposed Dismas's CCC facility. Based only on the hearsay declaration of its real estate agent regarding a conversation he allegedly had with Mr. Timothy Vickers of the ENCPPOA, Bannum continues to assert that the ENCPPOA "vehemently resisted 'a group that planned to locate a CCC there.'" Bannum's Reply at 13. Bannum now goes so far as to say that it "knows that 'group' to be Dismas." *Id.* Bannum provides no evidence for this claim, nor does Bannum inform the Court as to its source for this information. On the other hand, Dismas provided a declaration by Steven S. Vice, Dismas's Vice President of Business Development, detailing his communications with the same Mr. Timothy Vickers attesting to the ENCPPOA's approval of Dismas's renovation plans for the CCC, and attaching supporting correspondence between Dismas and the ENCPPOA. AR 3791-

98.[6] Dismas is simply unaware of any opposition from ENCPPOA and, other than Bannum's unsupported hearsay declaration, there is no evidence of any.[7]

If the ENCPPOA were opposed to Dismas's operating a CCC facility, it never would have approved Dismas's renovation plans for the proposed CCC facility. Therefore, Bannum's claim that "Dismas will be unable to mitigate the Association's opposition" is premised solely on Bannum's own supposition, and is demonstrably wrong. The record clearly shows that the ENCPPOA ACC *has approved* Dismas's renovation plans for the CCC facility, and has evinced no opposition to Dismas's operating a CCC facility. AR 3789-3802.

## III. BANNUM FAILED TO ADDRESS THE BAD FAITH STANDARD

Each of Bannum's allegations is rooted in Bannum's assumption that BOP is improperly "retaliating" against Bannum. *See* Bannum's Reply. When claiming bad faith on the part of Government officials, the protester must show "well nigh irrefragable proof" of a specific intent on the part of the Government officials to harm the protester. *L.P. Consulting Group, Inc. v. United States*, 66 Fed. Cl. 238, 243 (2005). Government officials in conducting procurements enjoy a presumption that they have acted in good faith. *See Galen Medical Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004). A protester may overcome this

---

6 Bannum objects to Dismas's use of Mr. Vice's declaration (and more importantly) to the attached written correspondence with the ENCPPOA. Bannum's Reply at 13 n.2. Bannum objects that these documents were not "admitted into the AR by this Court." *Id.* That is not entirely accurate. While these documents were not admitted by this Court as a pleading in Bannum's previous protest (06-744), they are clearly a part of the AR in this case, at AR 3791-98, and therefore can be cited in motions on the administrative record in this case.

7 Bannum asserts that this Court should suspend the rules of evidence because the Court is deciding this issue based on the administrative record. Bannum's Reply at 14. However, this Court is governed by both the RCFC and the Federal Rules of Evidence. *See* 28 U.S.C. § 2503(b) ("The proceedings of the Court of Federal Claims shall be in accordance with such

presumption only through alleging and proving, by clear and convincing evidence, that BOP acted in bad faith. *Id.* at 1330. To date, Bannum has failed even to address this standard, much less provide evidence of any kind (much less clear and convincing evidence), of any bad faith on the part of BOP.

Here, as noted in Dismas's initial brief, the record establishes that BOP acted with, if anything, a surfeit of care and consideration for Bannum. In its reply brief, Bannum provides only unsupported allegations (mainly without record cites) regarding BOP's allegedly biased actions.[8] BOP did not abuse its discretion (much less act with an intent to injure) in eliminating Bannum from the competition. Far from acting with animus towards Bannum, BOP actually has provided Bannum multiple extraordinary opportunities over the course of this procurement to provide a proposal that meets the Solicitation's requirements. Bannum bears the responsibility for regularly failing to meet those requirements. BOP properly eliminated Bannum's proposal.

## IV. BANNUM HAS FAILED TO SHOW THAT IT SHOULD BE AWARDED INJUNCTIVE RELIEF

As stated above, and in Dismas's and the Government's previous briefs in this case, Bannum has failed to prove any prejudicial error or illegality in the procurement. For that reason alone, Bannum should not be awarded injunctive relief. Even assuming *arguendo* that it has proved some error, Bannum cannot show that injunctive relief is otherwise justified, because

---

rules of practice and procedure (other than the rules of evidence) as the Court of Federal Claims may prescribe and in accordance with the Federal Rules of Evidence.").

[8] For example, Bannum contends that BOP [redacted] as an act of retaliation. Bannum's Reply at 18 n.5. However, upon information and belief, BOP [redacted].

Bannum will suffer no irreparable harm, the balance of the harms favors Dismas and BOP, and the public interest counsels against injunctive relief. *See PGBA, LLC v. United States*, 389 F.3d 1219, 1229 (Fed. Cir. 2004) (denying injunctive relief despite prejudicial error in procurement).

**A. Bannum Will Suffer No Irreparable Harm Should The Court Not Remand This Case**

Bannum will suffer no irreparable harm. *See, e.g., PGBA*, 389 F.3d at 1229. Bannum claims that it will suffer the irreparable harm of lost profits on the Contract. Bannum's Reply at 19. Such a harm rises to the level of irreparable harm sufficient to warrant judicial intervention only if Bannum were denied the opportunity to compete for the Contract on a "level playing field," or the agency had erred egregiously enough to prejudice Bannum in future procurements, but not simply because Bannum will lose profits as a disappointed bidder. *Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674-75 (D.C. Cir. 1985) ("Recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business.") (citation omitted); *Seattle Sec. Services, Inc.*, 45 Fed. Cl. at 571-72 ("This type of loss, deriving from a lost opportunity to compete on a level playing field for a contract, has been found sufficient to prove irreparable harm.") (emphasis added); *Hosp. Klean of Texas, Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005) ("Such loss of profit, stemming from a lost opportunity to compete for a contract on a level playing field has been found sufficient to constitute irreparable harm.") (emphasis added); *Filtration Dev. Co., LLC v. United States*, 60 Fed. Cl. 371, 385 (2004) (holding lost profits to be an irreparable harm where the agency acknowledged that the protester and the awardee were "no longer on equal footing."); *see Norfolk Dredging Co., Inc. v. United States*, 58 Fed. Cl. 167, 184-85 (2003) (holding lost profits to be irreparable harm where the agency violated procurement law); *United Int'l Investigative*

*Services, Inc. v. United States*, 41 Fed. Cl. 312, 322-23 (1998) (holding lost profits to be an irreparable harm where the protester proved a significant prejudicial error in the procurement process).

Here, if anything, the playing field was tipped in favor of Bannum, not Dismas. BOP allowed Bannum multiple opportunities [redacted] that meets the Solicitation's requirements. In the course of this procurement, BOP has already twice elected to reinstate Bannum into the competition, when BOP would have been well within the law and its authority in eliminating Bannum's proposal. At every step, Bannum has loudly complained, pointing its finger at everyone save Bannum itself. In response, BOP has bent over backwards to accommodate Bannum, first delaying contract award, and now delaying commencement of performance on the awarded contract. In short, Bannum has not been irreparably harmed based on an evaluation that, if anything, was heavily skewed in Bannum's favor.

**B. The Balance Of Hardships Favors Dismas And BOP**

The balance of hardships favors Dismas and BOP, not Bannum. *See, e.g., Info. Sciences Corp. v. United States*, 73 Fed. Cl. 70, 128 (2006) (citing *PGBA*, 389 F.3d at 1229). Here, the harm to Dismas and BOP easily outweighs any harm to Bannum. Unlike Bannum, Dismas is ready to begin Contract performance immediately following the disposition of this case and will continue to be ready to do so because Dismas is willing to make the kind of investments [redacted] throughout the procurement process. Bannum's requested relief of additional "reasonable time" to respond to discussions, if granted, would not only be extraordinary, but would also continue to delay permanent operations at a CCC facility in Orlando, and such delay would be based on Bannum's admitted failure to comply with the Solicitation. After 15 months, Bannum [redacted]; Bannum

has been given well more than a "reasonable time" [redacted]. Accordingly, the balance of hardships tilts in favor of Dismas and BOP here.

### C. Injunctive Relief Will Not Serve The Public's Interest

Injunctive relief is not in the public interest. *See, e.g., Info. Sciences. Corp.*, 73 Fed. Cl. at 128-29 (citing *PGBA*, 389 F.3d at 1229). Bannum asserts that the public interest will not be harmed by leaving the CCC inmates at [redacted] [redacted] facility, because "[t]here is no evidence that the [redacted] is unable to service the area inmates eligible for CCCs." Bannum's Reply at 20. Yet two pages earlier, Bannum directly contradicts its own assertion, claiming that [redacted] [redacted] "facility could not handle" the inmates transferred from Bannum's Orlando facility. Bannum's Reply at 18. If [redacted] facility can handle the inmates, then Bannum has further undermined its argument on the merits that BOP somehow acted in bad faith and, thereby, Bannum deserves no relief. On the other hand, if Bannum is correct that [redacted] facility cannot handle these inmates, then the public interest would best be served by immediately transferring them to Dismas's ready-to-perform facility in Orlando. Thus, regardless of which statement is correct, the public interest is best served by allowing BOP's inmates in the Orlando area to reside in a permanent CCC facility rather than by accommodating them through the use of bridge contracts or other artifices. *See Ellsworth Assocs., Inc. v. United States*, 45 Fed. Cl. 388, 399 (1999) (noting that the public interest is served by "timely completion of government contracts"). Thus, the public interest is best served in having Dismas's permanent CCC facility operational as soon as possible.

## CONCLUSION AND RELIEF REQUESTED

A full 15 months after BOP issued the Solicitation, *Bannum* [redacted] *that meets the Solicitation's requirements.* Bannum is clearly not ready to perform the Contract, and Bannum's inability to perform is not BOP's responsibility, but rather is based on Bannum's business misjudgments. BOP was well within its discretion to eliminate Bannum from the competition. For the foregoing reasons and those stated by the Government in its pleadings in this case, Dismas respectfully requests that the Government's and Dismas's motions be granted, Bannum's motion be denied, and this case be dismissed with prejudice.

Dated: March 28, 2007

Respectfully submitted,

s/ Alex D. Tomaszczuk by s/ Daniel S. Herzfeld
Alex D. Tomaszczuk
PILLSBURY WINTHROP
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, VA 22102

703.770.7940
703.770.7901 (fax)

Attorney of Record
Dismas Charities, Inc.

*Of Counsel*:

Daniel S. Herzfeld
Orest J. Jowyk
PILLSBURY WINTHROP
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, VA 22102
703.770.7900
703.770.7901 (fax)