**AGREED TO PUBLIC COPY**
**MAY BE MADE PUBLIC**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| BANNUM, INC. | ) | |
| Plaintiff, | ) | |
| | ) | No. 06-744C |
| v. | ) | Judge Allegra |
| | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

# BANNUM'S MOTION FOR SUMMARY JUDGMENT ON THE ADMINISTRATIVE RECORD

Michael A. Gordon
s/ Michael A. Gordon
Counsel of Record for Bannum, Inc.
HOLMES & GORDON
17 West Jefferson Street, Suite 202
Rockville, Maryland 20850
(301) 340-1251 (telephone)
(301) 340-1253 (facsimile)

OF COUNSEL:
Fran Baskin, Esquire
HOLMES & GORDON
17 West Jefferson Street, Suite 202
Rockville, Maryland 20850
(301) 340-1251 (telephone)
(301) 340-1253 (facsimile)

March 6, 2007

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

**TABLE OF CONTENTS**


BANNUM'S MOTION FOR SUMMARY JUDGMENT 1

NATURE OF THE CASE 1

ISSUES PRESENTED 2

SUMMARY OF THE ARGUMENT 3

STATEMENT OF THE FACTS 6

A. The Federal CCC Program 6

B. Bannum's Incumbent Contract 6

C. The Request for Proposals 7

D. The BOP First Attempts to Eliminate Bannum By Setting Aside the Procurement 8

E. BOP's First Refusal to Extend the Time for Initial Offers 11

F. Bannum's Request for an Extension is Denied Again 11

G. The BOP's Improper Decision to Award on Initial Offers 12

H. Bannum is Eliminated and then after Protest, is "Reinstated" in the "Competition" 13

I. Dismas [redacted] 14

J. Evaluation Records are Manipulated to Remove [redacted] Deficiency 15

K. [redacted] 16

L. The Source Selection Decision and Direct Award to Dismas 16

M. Bannum's Inmates are Transferred to [redacted] 17

N. Bannum's GAO Protest 18

O. Bannum's First Action in this Court 18

**AGREED UPON REDACTED COPY MAY BE MADE PUBLIC**

P. BOP's Implementation of its "Remedial Action" 19

Q. The Initial Responses to Discussions on January 8, 2007 20

R. The BOP's Evaluation of Initial Responses 21

S. Responses to the Second Round of Discussions 22

T. Bannum is Eliminated 23

U. Further Discussions with Keeton on its Zoning Restriction 24

LEGAL ARGUMENT 25

I. Standard of Review 25

II. Bannum is Likely to Succeed on the Merits 26

A. The BOP Failed to Implement Proper or Reasonable Remedial Action 26

B. Bannum Was Entitled to Additional Discussions 28

C. The BOP Conducted Unequal, Inconsistent and Unfair Discussions 29

1. [redacted] Zoning was Deficient 29

2. The BOP Failed to Require Dismas to Address the [redacted] and [redacted] 31

3. Keeton Should Also Be Disqualified 32

D. Bannum Has Been the Victim of Improper BOP Retaliation 33

E. Bannum Has Established Competitive Prejudice 33

III. Injunctive Relief is Appropriate 34

CONCLUSION AND REQUEST FOR RELIEF 34

**COURT CASES**

Alfa Laval Separation v. United States, 40 Fed. Cl. 215, 234 aff'd 175 F.3d 1365 (Fed. Cir. 1999) 30

Beta Analytics v. United States, 69 Fed. Cl. 431 (2005) 27

Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415 (1971) 25

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**


Dubinsky v. United States, 43 Fed. Cl. 243, 264 (1999) 25, 30

Information Sciences Corp. v. United States, 73 Fed. Cl. 70 (2006) 25

JWK International Corp. v. United States, 52 Fed. Cl. 650, 661 (2002) 30

Norfolk Dredging, Co. Inc. v. United States, 58 Fed. Cl. 167, 184-85 (2003) 34

Orca Northwest Real Estate Services v. United States, 65 Fed. Cl. 1, 11 (2005) 30

Seattle Security Services, Inc. v. U.S, 45 Fed. Cl. 560 (2000) passim

Textron, Inc. v. United States, 74 Fed. Cl. 277, 291-2 (2006) 27

**ADMINSITRATIVE DECISIONS**

Computer Sciences Corp., B-190632, Aug. 9, 1979, 79-2 CPD ¶102 27

Ford Aerospace Corporation et al, B-239676-.5, March 8, 1991, 91-1 CPD ¶260 27

Kaufman Lasman Associates, Inc., 68 Comp. Gen. 34 (October 21, 1988), B-229917, B- 229917.9, 88-2 CPD ¶381 27

Smith & Wesson, B-232681-.2, .3, February 9, 1989, 89-1 CPD ¶134 27

**STATUTES AND REGULATIONS**

5 U.S.C. §706 25

18 U.S.C. §3624(c) 6

28 U.S.C. §1491(b) 25

4 CFR §21.3(c) 18

13 CFR §121.103 32

Federal Acquisition Regulation ("FAR") §52.215-1 16

**COURT RULES**

CFC Rule 52.1 1, 25

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| BANNUM, INC.<br>Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES,<br>Defendant, | ) | No. 07-109 C<br>Judge Allegra<br>**FILED UNDER SEAL** |
| | ) | |
| and | ) | |
| | ) | |
| Dismas Charities, Inc.,<br>Defendant-Intervenor. | ) | |

MOTION FOR SUMMARY JUDGMENT ON THE ADMINISTRATIVE RECORD

Pursuant to Rule 52.1 of the United States Court of Federal Claims ("CFC"), Plaintiff, Bannum, Inc. ("Bannum") respectfully moves this Court for summary judgment on the administrative record ("AR"). In support of this motion, Bannum relies on its Statement of Facts and the AR.

NATURE OF THE CASE

Summary judgment for Bannum is appropriate because Defendant, United States, acting through the Federal Bureau of Prisons ("BOP") improperly eliminated Bannum from the competition for a contract for Community Correctional ("CCC") services in Orlando, Florida under BOP Request for Proposals No. 200-0880-SE ("RFP"). The BOP improperly structured its "remedial action" resulting from Bannum's protest to this Court in Bannum Inc. v. United States and Dismas Charities, Inc., No. 06-744C, to prevent Bannum from having a reasonable time [redacted] which became necessary to overcome the prejudice caused by the BOP's illegal award to Dismas Charities, Inc. ("Dismas") on initial offers, thereby giving Dismas an improper competitive advantage. Further, the BOP engaged in unfair, inconsistent and unequal discussions.

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

## ISSUES PRESENTED

1. Whether the BOP's "remedial action" was improperly structured to unduly favor Dismas, by providing inadequate time for offerors in the competitive range like Bannum [redacted], a need that was caused by the BOP's improper award to Dismas on initial offers?

2. Whether the BOP's refusal to provide discussions and its elimination of Bannum from the competitive range [redacted] violated the RFP?

3. Whether discussions should have continued with Bannum based on BOP fault, misevaluation of Bannum's proposal revision, the failure to conduct meaningful discussions, and the fact that all alleged flaws could have been easily corrected?

4. Whether the BOP engaged in inconsistent and unequal discussions in that the BOP:

(a) misevaluated [redacted] zoning deficiency by improperly labeling it a "clarification", and finding [redacted] offer acceptable even when it failed to remedy the defect during the first and second round of discussions;

(b) improperly failed to ask Dismas in discussions, questions relating to community opposition from its closest local concern and, consequently failed to perform the "remedial action" represented to this Court to determine whether Dismas was a responsible offeror based on its failure to disclose a private restrictive covenant and this opposition to its facility in its initial offer?

(c) failed to eliminate [redacted] from the competition for the false representations of its status as a small business during the procurement.

5. Whether the BOP's "remedial action" was improperly motivated by retaliation against Bannum for filing grievances and protests?

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

## SUMMARY OF ARGUMENT

The BOP's "remedial action" following Bannum's first protest in this Court was a sham intended to eliminate Bannum through imposition of unreasonable time frames, and as the AR initially withheld confirms, by unfair, inconsistent and unequal discussions.

Bannum's initial protest in this Court alleged that the procurement had been improperly stacked against Bannum from the start, and that each BOP action was designed to harm or eliminate Bannum. Once most of the AR was produced in the initial protest, the BOP took "remedial action" because it could not or would not explain how evaluated material "deficiencies" in Dismas' and [redacted] initial offers had conveniently disappeared to facilitate an award to Dismas. To remedy the BOP's error, discussions were to be held with all offerors in the competitive range, including Bannum. Consistent with its prior conduct, the BOP designed this "remedy" to eliminate Bannum.

During the incumbent contract, Bannum had been [redacted] Because of the BOP's improper decision to award on initial offers, Bannum's [redacted] and an improper award was made to Dismas in July 2006.

As a result of that improper award, Dismas [redacted] In contrast, five months later, in December 2006, when the BOP finally took remedial action, [redacted]

**AGREED UPON REDACTED COPY
MAY BE MADE PUBLIC**

The BOP knew that [redacted] and quickly confirmed that fact. Yet, in spite of the prejudice to Bannum and [redacted], the BOP "imposed unreasonable due dates in its "remedial action."

In CCC procurements, the BOP allows <u>at least</u> 120 days for offerors [redacted] Although the BOP's procurement errors had caused [redacted], the SSA only gave offerors 11 days, during the New Year holidays, to respond to discussions. [redacted] withdrew because [redacted] in that time. While Bannum attempted to comply, it ultimately received a total of 45 days [redacted] The BOP thus created an unfair competitive advantage for Dismas, which, as a result of BOP's procurement error [redacted]

Bannum's elimination also violated the RFP which [redacted] Moreover, the BOP was purporting to take discussions as "remedial action". Thus, the BOP violated the RFP and abused its discretion by depriving Bannum of an opportunity to resolve issues [redacted]

Further discussions were also required as the alleged defects in Bannum's revised offer were the BOP's fault [redacted], its misevaluation of Bannum's [redacted] its failure to provide meaningful discussions. All issues could have been easily corrected.

**AGREED UPON REDACTED COPY MAY BE MADE PUBLIC**

Bannum was also subject to improper and unequal discussions. The BOP purported to "re-evaluate" the initial technical proposals of offerors in the competitive range submitted in March 2006. However, the Technical Evaluation Panel ("TEP") perpetuated the improper elimination of a "significant deficiency" in [redacted] zoning for its facility (which would have taken a substantial amount of time to resolve if it could be resolved), and mislabeled it a "clarification." Although [redacted] was unable to resolve its zoning defect in discussions, [redacted] was improperly found acceptable.

Dismas also received improper unequal treatment in discussions. Bannum had submitted evidence that Dismas had failed to disclose in its initial offer, a restrictive covenant precluding its proposed facility's use for residential purposes, which would include a CCC, and opposition to its facility from the closest local concerns.

In its motion to dismiss, Defendant represented that the alleged non-disclosures would be evaluated in discussions. In spite of these statements to the Court, the BOP ignored this "remedial action" and no questions were asked of Dismas on this topic.

The BOP also ignored [redacted] misrepresentation of its status as a small business. [redacted] only withdrew this misrepresentation in its FPR, inaccurately claiming its "situation" had changed.

Finally, the record shows that the BOP's latest "remedial action" follows its pattern of improper retaliatory conduct against Bannum in this procurement.

Bannum was prejudiced by these BOP errors. Bannum's offer [redacted] If [redacted] were able to become acceptable through discussions, Bannum [redacted]. Thus, if proper discussions were conducted, Bannum's FPR would be the best value.

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

STATEMENT OF THE FACTS

A. The Federal CCC Program

The contract at issue is for a Community Corrections Center ("CCC") services. The BOP is under a statutory obligation to assign suitable federal offenders to a CCC or similar penal institution designed to prepare them for re-entry into the prisoner's community for part of the last 10% of their sentences. 18 U.S.C. §3624(c). The mission of a CCC is to assist inmates assigned to a CCC into becoming law abiding members of society in their local area through work and self-improvement opportunities. AR 6, 14.

B. Bannum's Incumbent Contract

Bannum has performed CCC services for the BOP since 1984. AR 707. Bannum was the incumbent contractor from 2001 to 2006. However, in Orlando, [redacted]. AR 1131-83.

On December 9, 2004, Bannum filed a grievance against [redacted] with the BOP. AR 1184-89. Bannum alleged that [redacted] attempted to have Bannum's CCC inmates assigned to [redacted] CCC facility [redacted] AR 1185.

When [redacted] supervisor did not take action against [redacted] or otherwise restrain her interference with Bannum's contract, on January 28, 2005, Bannum filed a grievance against him. AR 1266-67. Bannum was advised that these grievances had been referred to an investigation by the BOP Office of Internal Affairs. AR 1263.

**AGREED UPON REDACTED COPY
MAY BE MADE PUBLIC**

On or about in October 2005, [redacted] was transferred from her position as the [redacted] in Orlando. Bannum believes her departure was involuntary and was the result of the investigation. In any event, [redacted] departure in October 2005, [redacted]

In the fall of 2005, Bannum met with BOP officials in Washington, D.C., including [redacted]

C. The Request for Proposals

The RFP, §B.1 states that the contractor is required:

> "to provide CCC services to male and female Federal offenders held under authority of various United States Statutes located in the Orlando (Orange County), Florida area... The Government intends to refer all eligible CCC requirements under this solicitation to the successful contractor." (emphasis added). AR 6.

No classes of inmates are ineligible for BOP assignment under the RFP.

The BOP "CCC Program Statement 7310.04 "Community Correctional Services (CCC) Utilization and Transfer Procedures" AR 1223-24, inmates with a "history of violence" are eligible for assignment to a CCC unless other factors are present. Id.

[redacted]

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

In this procurement, offerors were first advised on August 26, 2005 that they would need [redacted] in a Request for Information ("RFI"). AR 1316-17. The RFP was issued on November 30, 2005. AR 1. Initial offers were to be submitted on January 30, 2005, 60 days later. AR 4. The BOP disclosed its anticipated performance date of August 1, 2006. AR 6.

In the initial offer, contractors were to provide a right to use signed by both parties, which would be satisfied by contingent leases or deeds. AR 140, 119. Also required was a plan to obtain zoning, notification letters to the local officials, evidence of community support and floor plans. Id., AR 138-39. If discussions were held:

> "valid proof of all zoning and local ordinance requirements necessary for operation of a Community Corrections Center ...within 60 days after the date of initial proposal submission." (emphasis added) AR 140.

Thus, offerors had a total of 270 days or 9 months [redacted]

> [redacted] AR 139.

D. The BOP First Attempts to Eliminate Bannum By Setting Aside the Procurement

The CCC services being procured here were for a period of up to 10 years. AR 6. This contract was one of the first performance-based BOP CCC contracts. AR 1.

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

In spite of the difficulty represented by performance-based contracting, the BOP contacted a number of small businesses, two of which were potentially interested. AR 1411. But no set aside decision was made until it was discovered that [redacted] was small.

In fact, [redacted] had first represented in its RFI response to the BOP that it was a large business. AR 1334A. [redacted] disclosed that it would be proposing a facility for this contract being run by [redacted] [redacted] also stated that it had 7 BOP CCC contracts. Id. In spite of this information, when someone in the BOP discovered that [redacted] had represented itself to be a small business on the SBA's website, AR 1387-92, the BOP quickly contacted [redacted]

Although [redacted] corporation, run by [redacted] President, was not listed as an affiliate in the SBA Website, and the dollar amount of the 7 [redacted] BOP contracts exceeded the size standard, on November 3, 2005, [redacted] represented that it was a small business and confirmed its size to the BOP in writing. AR 1390, 1404, 2147.

To justify this unusual set aside for one of the first performance-based CCC contracts, in the memorandum to BOP reviewers, the SSA emphasized that [redacted] was as small business that had 3 CCC contracts in the Southeast Region. AR 1411. The AR contains nothing indicating any effort by the BOP to confirm the accuracy of [redacted] convenient change in status. Yet, on November 3, 2005, the BOP's Source Selection Authority ("SSA") designated the procurement a small business set aside. AR 1409.

The result of the set aside was that Bannum, a large business, became ineligible. Bannum ceased its efforts on its initial offer.

**AGREED UPON REDACTED COPY
MAY BE MADE PUBLIC**

On December 12, 2005, Bannum submitted a "draft protest" of the set-aside based on the belief that [redacted] was one of the alleged small businesses. Bannum provided evidence that [redacted] was affiliated with [redacted] and that [redacted] had 6 BOP contracts, the receipts from which made [redacted] a large business under the CCC size standard. AR 1455-56. Bannum alleged that the set aside was part of [redacted] unfair favoritism to [redacted] as set forth in Bannum's grievances. AR 1457, 1468.

On or about December 13, 2006, the SSA met with [redacted] to discuss the situation which were viewed as Bannum's "conspiracies." AR 1471. The BOP should have known from [redacted] BOP receipts (not counting the earnings of its affiliate [redacted]) that Bannum was correct and that [redacted] had misrepresented its status as a small business to the BOP and to the Small Business Administration. However, the BOP took no action against [redacted]

Instead, on December 14, 2005, the SSA contacted the other 2 small firms that had responded. AR 1427. [redacted] was not contacted. Id. The SSA learned that one of the businesses would not participate. The other did not return the call. Id. Apparently, the failure to receive a return call gave the BOP a way out. However, in the SSA's memorandum to the BOP reviewers explaining why the set aside restriction was now being withdrawn, no mention was made of [redacted] misrepresentations or the allegations in Bannum's draft protest. AR 1437-38.

Nothing in the record indicates that the BOP made any further inquiry of [redacted] representations or referred to the SBA or its Inspector General regarding [redacted] small business misrepresentations. Instead, [redacted] was permitted to participate in the competition for this contract.

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

E. BOP's First Refusal to Extend the Time for Initial Offers

Amendment 1 to the RFP, dated December 19, 2005, removed the small business set aside restriction. However, in spite of the fact that large businesses like Bannum had been ineligible, the BOP did not extend the time for submission of initial offers. AR 147.

On December 20, 2005, Bannum sought a 60-day extension, noting that it had lost 47 days while ineligible. AR 1475. The BOP only extended the time for submission for 30 days to March 1, 2006. AR 1478-79.

F. Bannum's Request for an Additional Extension is Denied

Based on initial offers being received on March 1, 2006, under the apparent scheduled Pre-award Milestones Report, a document not produced in the GAO proceeding, the BOP evaluators had until March 20, 2006 to review proposals, conduct pre-site checks, issue discussion questions and enter negotiations. AR 1739. Because these internal deadlines looked difficult to achieve, on February 8, 2006, TEP members requested a conference with the SSA to request an extension of Bannum's incumbent contract. AR 1552.

On February 9, 2006, Bannum requested a 30-day extension for initial offers. Bannum stated [redacted]. AR 1490.

Apparently aware of Bannum's request, on February 9, 2006, when the 2-month modification of Bannum's contract was proposed, the BOP's response was an adamant "no way." The SSA received "notice from [redacted] not to modify the RFP—CCB[1] doesn't want it done—Keep as is." Id.

[1] Defendant asserted that the handwritten letters are "CCB" or Community Correction Branch.

**AGREED UPON REDACTED COPY
MAY BE MADE PUBLIC**

On February 10, 2006, the BOP denied Bannum's request for a time extension based on alleged "endangerment" to the award schedule. AR 1492. Because Bannum's extension request was denied, [redacted]

G. The BOP's Improper Decision to Award on Initial Offers

On March 1, 2006, initial offers were received from 4 offerors—Bannum, Dismas, [redacted]. AR 151. On March 7, 2006, the proposals were received by the SSA. AR 153. On March 10, 2006, offerors were sent notices of the BOP pre-site visits to their proposed facilities scheduled for March 22-23, 2006. AR 159-62.

On March 30, 2006, [redacted], then the Chairperson of the TEP, issued a draft of a document entitled "Request to Open Discussions #1," called C&D #1 (Clarifications and Discussions) which was circulated to TEP members. AR 166. No one from the TEP took exception. AR 167-68. In this version of C&D #1, and in the April 1, 2006 version (neither of which versions was included in the documents the BOP produced to the GAO), all offerors, including Dismas, had at least one deficiency.

Dismas had failed to include [redacted] AR 230.

[redacted] also had a one deficiency:

> "Offeror shall submit revised zoning letter to accept all offenders, regardless of their offenses." AR 2381.

This deficiency was based on the zoning for [redacted] proposed CCC, which had been granted by the City of Orlando on condition that:

> "Sex offenders and individuals with a history of violence are not accepted into the program." AR 2018.

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

Bannum's initial offer [redacted] AR 2378-79.

In the April 3, 2006 C&D #1, [redacted] initial offer had 4 deficiencies including a failure to provide "proof of zoning or conditional use permit" and a failure to provide a CPM diagram. AR 2380.

A version of C&D #1 dated April 4, 2006 was produced to the GAO and was included in the first AR produced here. AR 166-73. However, in this revision, Dismas had no deficiencies. AR 169.

In an e-mail dated April 20, 2006, which was not produced to the GAO and for which no metadata was produced here, the TEP Chairperson wrote to [redacted]:

> "After we conducted an initial evaluation on March 28, 2006, I was asked to meet with [redacted], [redacted] and [redacted] to discuss the result of the evaluation, and the panel's recommendations. It was recommended making awards without conducting discussions. Dismas Charities, submitted a proposal that met all the government's requirements, did not require discussions to address any deficiencies or significant weaknesses. The proposals from Bannum, [redacted] and [redacted] contained significant deficiencies and failed to meet the minimum requirements of the government. In order for the proposals from Bannum, [redacted] and [redacted] to be acceptable, the government would have had to conduct discussions...." (emphasis added) AR 1554.

H. Bannum is Eliminated and then after Protest, is "Reinstated" in the "Competition"

Both Bannum and [redacted] On May 3, 2006, the SSA sent notices to Bannum and [redacted] eliminating them from the competition because [redacted], the same "deficiency" cited in the C&D #1. AR 1658-59.

On May 3, 2006, Bannum filed an agency protest, stating that [redacted] The BOP highlighted this part of Bannum's protest. AR 434-45.

**AGREED UPON REDACTED COPY MAY BE MADE PUBLIC**

The BOP orally denied Bannum's agency protest. On May 8, 2006, Bannum protested to the GAO. AR 427-31.

On May 12, 2006, the BOP rescinded its May 3, 2006 letter and supposedly "reinstated" Bannum's proposal into the "competition." AR 436. However, this "reinstatement" was a sham since the BOP already had made a decision to award to Dismas, allegedly the only offer with no deficiencies. AR 2400-02.

I. <u>Dismas Fails</u> [redacted] he was advised by the developer that there was a restrictive covenant applicable to properties at the Edgewater North Commerce Park Association ("Association"). AR 1226. The applicable covenant states in pertinent part:

> "No Lot shall be used except for commercial, warehouse, and industrial purposes, including office buildings and office space. Temporary uses by Developer for model facilities, sales displays, parking lots, sales offices and other offices, or any one or combination of such uses, shall be permitted until permanent cessation of such uses takes place. No changes may be made in buildings erected by the Developer (except if such changes are made by the Developer) without the consent of the Architectural Control Committee as provided herein." AR 1239.

The Association's covenant does not permit residential uses. AR 1239. Dismas knew [redacted] that a CCC was a residential use. AR 179. When Bannum's real estate agent contacted the developer regarding the restrictive covenant, he:

> "...warned me that a residential facility like a CCC was not permitted and that there was resistance to another group that planned to locate a CCC there. He told me to contact Timothy Vickers, the owner of a lot and a member of the Edgewater North Commerce Park Property Owners Association, Inc.'s Architectural Committee. Mr. Vickers said that they believed a CCC was not permitted under the covenant and he and the other property owners were vehemently opposed to allowing one there. He said the Committee would never approve a CCC. " AR 1226.

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

Dismas' initial offer included [redacted] as proof of its right to use the facility as a CCC. AR 857. The [redacted] AR 860. However, Dismas [redacted] Id.

The Association members located in the same Industrial complex are the closest concern in the local community and are within .5 miles of Dismas' proposed CCC. AR 187, 865. Although required by the RFP, AR 119-20, Dismas [redacted] AR 179, 186, 857-68.

J. Evaluation Records are Improperly Manipulated to Remove [redacted] Deficiency

Two weeks after Bannum's "reinstatement" in the competition, on May 26, 2006, the SSA issued a formal determination to award to Dismas without discussions. AR 1665. However, internal BOP documents were changed to indicate that [redacted] offer also contained no deficiencies. AR 2737.

In the versions of the CWPs dated May 18, 2006, ratings were given to the offerors in the various factors. Under the Site Validity and Suitability Factor "discussion items," [redacted] CWP stated:

> "Offeror must provide proof of zoning to accept all offenders, regardless of their offenses."
>
> However, an italicized comment without attribution added:
>
> "*We did n't requested and it is not in the PWS. Therefor no discussion require. They will receive full point*." AR 2473.

Up to this point, the TEP had continuously found [redacted] zoning restriction was a deficiency. AR 172, 1554, 2381, 2386, 2400, 2402.

**AGREED UPON REDACTED COPY MAY BE MADE PUBLIC**

The SSA's Past Performance Evaluation was also revised as of June 23, 2006. In direct conflict with the RFP and representations by the BOP to Bannum, it now included [redacted] AR 838-50.

K. [redacted]

[redacted] AR 449-607. [redacted] AR 1189, 375.

On June 29, 2006, the BOP sent Bannum a letter stating that [redacted]

[redacted] AR 2550-01.

L. <u>The Source Selection Decision and Direct Award to Dismas</u>

The Source Selection Decision ("SDD") perpetuated the changes to the evaluation record. Dismas and [redacted] were both touted as having no deficiencies. AR 378. No reference was made to Dismas' failure to submit [redacted] or [redacted] zoning.

M. <u>Bannum's Inmates are Transferred to</u> [redacted]

The BOP had no CCC facility in Orlando, other than Bannum's CCC, to provide CCC services to approximately 70 inmates from July 9, 2006 when the incumbent contract expired to November 1, 2006, when Dismas was scheduled to begin its performance. AR 1521, 1679. Yet, the BOP did not extend Bannum's contract.

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

Although Bannum told the BOP officials that its incumbent facility lease could be extended for the current contract and was available, the BOP transferred 60-70 inmates from Bannum's CCC to [redacted]. This decision was made without contacting Bannum even though [redacted] did not have adequate space for the inmates in its Ocala CCC that were transferred from Bannum's Orlando CCC. The [redacted] CCC was properly rated to house up to 20 inmates and did not have adequate staff to handle the transferees. AR 3039-40.

To handle this situation, the BOP CCM for the [redacted] advised [redacted], now a former [redacted] employee, to keep renewing the 3-day passes in violation of CCC regulations and the contract. Id. Because [redacted] is approximately 70 miles from Orlando, Bannum believes the inmates transferred from Orlando who were not released to home confinement lost their jobs and could no longer receive community services in the Orlando area. See Id., AR 6, 14-15, 1214-15.

N. Bannum's GAO Protest

On July 14, 2006, Bannum timely protested the award to the GAO which included specific document requests. AR 1083-93. On August 7, 2006, the BOP refused to produce all of the documents requested and provided a list of all documents the BOP considered relevant under 4 CFR §21.3(c). AR 1096-98. The BOP represented that it would produce the documents for Bannum requests relating to "communications relating to the decision on whether to conduct discussions" and "proposal evaluation." As here, it claimed the proposals and evaluations of other offerors were irrelevant and refused to produce them. Id.

**AGREED UPON REDACTED COPY
MAY BE MADE PUBLIC**

On August 9, 2006, Bannum objected to the BOP's view of relevance. AR 1099-102. However, on August 14, 2006, the GAO did not require further production. AR 1103. On the record before it, on October 16, 2006, the GAO denied Bannum's protest.

O. Bannum's First Action in this Court

On November 1, 2006, Bannum filed a bid protest action in this Court, No. 06-744C. When the AR was finally produced, many relevant documents that should have been disclosed to the GAO were now produced for the first time.

After Bannum filed its motion for summary judgment, and on or before December 7, 2006, the BOP determined to take "remedial action". AR 4269. On December 11, 2006, the BOP decided to take to issue a stop work order on Dismas' contract, to conduct discussions, and re-evaluate the proposals. AR 4270, 4272. While Defendant would not concede any procurement error had been made, Defendant represented that as part of its remedial action the BOP would determine during discussions whether Dismas was a responsible offeror based on Dismas' alleged failure to disclose certain risks. AR 4064.

Dismas opposed the motion and claimed it would be owed [redacted] if terminated. AR 4135. The Court granted the motion to dismiss on December 20, 2007.

P. BOP's Implementation of its "Remedial Action"

[redacted] on December 12, 2006, the BOP planned to revaluate, at least initially, only the March 2006 offers. AR 4188. On December 12, 2006, a schedule was set under which responses to discussions would be submitted by January 5, 2007, a decision made to request additional discussions by January 15, 2007 and a contract would be awarded by February 22, 2007. AR 4276.

**AGREED UPON REDACTED COPY MAY BE MADE PUBLIC**

On December 13, 2006, Bannum asked the BOP several questions including [redacted] the time frames for the evaluation, and the expected performance date. AR 4281.

On December 20, 2006, the reevaluation of the March 2006 initial offers was completed. The BOP was aware that offers had to [redacted] AR 4201-04.

For Dismas, no discussions were required regarding community relations in spite of the Association's opposition to the facility the BOP learned through the protest. AR 1226, 4201. In contrast, both [redacted] were asked to discuss their approach for mediating opposition, which was considered a "deficiency." AR 4201, 4204.

Although [redacted] initially had only one deficiency, it in the reevaluation, it was assigned two deficiencies in addition to the restrictions on the zoning for its facility, which had been eliminated in the prior evaluation. However, the restriction was not labeled. Id. [redacted] was not questioned about its small business misrepresentation.

On December 27, 2006, the BOP formally eliminated the requirement for a CPM diagram for this procurement and replaced it with a requirement for a sequential list of major construction elements and how long each item would take to be performed as part the 120-day plan. AR 4292-95. In their initial offers, both Dismas [redacted] as their plan to meet the 120-day availability requirement. AR 960, 1765. Yet, in the re-evaluation, the deficiency in Dismas' discussion question in the facility subfactor was eliminated while [redacted] facility subfactor, the deficiency remained. AR 4958, 4884.

**AGREED UPON REDACTED COPY
MAY BE MADE PUBLIC**

On December 27, 2006, the BOP sent a reply to Bannum's questions. The BOP did not directly answer [redacted] referring only to the SSA's December 11, 2006 letter. The BOP stated that an anticipated performance date had not been established. AR 4286.

On December 28, 2006, the offerors were sent written discussion questions. AR 4297-99, 4883-85, 4957-58, 4960-61. Without explanation, the restrictions on [redacted] zoning were no longer a "deficiency" but were labeled as a "clarification." Cf. AR 4960 with 172, 1554, 2381, 2386, 2400. The due date for responses was January 8, 2007.

By a letter dated January 4, 2007, [redacted] withdrew its proposal since:

> [redacted] AR 4876.

Q. The Initial Responses to Discussions on January 8, 2007

Bannum's January 8, 2007 response answered the discussion questions that were asked regarding its initial offer [redacted] Bannum protested the unreasonable time allotted for responses and absence of an expected performance date. AR 4386-88. Bannum stated that [redacted] Id.

On January 8, 2007, Dismas apparently submitted its response to discussions to Rebecca Canfield rather than to the SSA, as required by the SSA's letter. This error apparently was waived. AR 4978-79.

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

[redacted] responded to the discussion questions. However, [redacted] stated that it had been unable to have the restriction on its zoning removed. [redacted] stated that nothing in the City of Orlando zoning code which prohibited housing sex offenders and that it would request that the condition be "deleted." AR 5075.

R. The BOP's Evaluation of Initial Responses

On January 9, 2007, the responses of the offerors were given to the TEP. AR 4210-11. On January 10, the new TEP Chairperson stated that the offers of both Dismas and [redacted] were acceptable. Because Bannum [redacted] the TEP found that Bannum did not meet the solicitation requirements. AR 4212.

In a memorandum dated January 16, 2007, the SSA decided to allow Bannum more time to respond. AR 4215. After recognizing that offerors [redacted] the SSA then said:

> "Under normal conditions, BOP would eliminate Bannum from the competitive range at this point [redacted] as required by the Solicitation. Indeed, Bannum has now had more than 30 days since it was notified that the BOP intended to re-evaluate and open discussions [redacted]
>
> However, given the extended period between the award and the re-evaluation, I have determined it is appropriate to allow Bannum's proposal to remain under consideration and for Bannum to be able to respond to a second round of discussions." Id.

However, that same day, the SSA asked the TEP to re-evaluate offerors' compliance with [redacted] AR 4216-18. On January 17, 2007, the TEP found both Dismas and [redacted] were deficient. AR 4221. A list of Bannum "deficiencies" were compiled based on [redacted] Bannum was found not to have [redacted] AR 4221-22.

**AGREED UPON REDACTED COPY MAY BE MADE PUBLIC**

On January 18, 2007, all offeror were sent new discussion questions. The list of "deficiencies" in Bannum's discussion letter was expanded to include [redacted] AR 4406-097. However, Bannum's [redacted] was not identified as a deficiency. Letters were sent to Dismas and [redacted] concerning their deficient [redacted] AR 5026, 5080. Responses were due on January 26, 2007, 8 days later.

S. Responses to the Second Round of Discussions

On January 24, 2007, Dismas submitted a revision to its offer. AR 5034. Because Dismas [redacted]

On January 24, 2007, [redacted] submitted a revised [redacted] did not represent that the restriction on its zoning had been deleted. AR 5088.

On January 26, 2007, Bannum submitted its response. AR 4414-4505. After again protesting the time allowed, and the BOP's refusal to provide an anticipated performance date, Bannum stated that [redacted]

Bannum included [redacted]

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

Bannum's response included [redacted] AR 4416. On the basis of this submission and the short time for responses, Bannum protested that the alleged "deficiencies" be reevaluated. AR 4415-16.

T. Bannum is Eliminated

On January 30, 2007, the TEP found Dismas' and [redacted] offers were acceptable but that Bannum's offer was unacceptable. Listed as deficiencies were [redacted] AR 4229.

On February 6, 2007, Bannum was eliminated from the competition. The only additional defect stated in the SSA's letter eliminating Bannum was that [redacted] AR 4788.

On February 7, 2007, Bannum filed an agency protest of its elimination. AR 4365-70. On February 12, 2007, Bannum asked the BOP when it would receive a response. It was advised of the 35-day period in the FAR with no other promises. This action followed on February 15, 2007. Shortly thereafter, the BOP dismissed the agency protest without a response.

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

U. Further Discussions with [redacted] on its Zoning Restriction

Requests for FPRs were sent to Dismas and [redacted] which were to be submitted by February 15, 2007. AR 4234, 4251. On February 15, 2007, [redacted] submitted a letter from the City of Orlando which purported to answer whether [redacted] CCC could house sex offenders. AR 5251, 5290. The City official stated that there were no Orlando zoning laws that prohibited sex offenders from residing there. However, the official only cited the City's October 4, 2005 letter to note the public benefit determination. He did not delete or refute the statement in that letter that permission to use the facility as a CCC was only granted if "consistent" with the existing prohibition on [redacted] zoning on housing sex offenders or inmates with a history of violence. AR 2018. The official did not address whether inmates with a history of violence could be housed there. Id.

Keeton also stated in its FPR that it was changing its designation from a small business to a large business "due to our current situation." AR 5251.

LEGAL ARGUMENT

I. Standard of Review

The standard of review for granting relief in a bid protest case under 28 U.S.C. §1491(b)(4) and 5 U.S.C. §706 is whether the agency actions under protest are arbitrary, capricious, and abuse of discretion or otherwise not in accordance with law. Seattle Security Services, Inc. v. U.S, 45 Fed. Cl. 560 (2000); Dubinsky v. United States, 43 Fed. Cl. 243, 264 (1999).

While the Court's inquiry is limited to the APA standards and the AR under Court of Federal Claims Rule 52.1, this Court must engage in a substantial inquiry of the decision. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415 (1971).

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

Where this in-depth review discloses agency actions which lack a reasonable basis, or like here, are tainted by an improper motive to the protester's prejudice, such actions must be enjoined to preserve the integrity of the procurement process. As discussed below, Bannum's elimination resulted from unreasonable and prejudicial time frames imposed under the BOP's "remedial action", the BOP's failure to comply with the RFP, and inconsistent and unequal discussions.

Bannum has been competitively prejudiced. With further discussions, Bannum would have had a substantial chance to win this contract. Seattle Security Services, supra at pp. 570-71. The other factors, comparative harm and the public interest, favor injunctive relief. Id. As shown below, Bannum's motion for summary judgment under CFC Rule 52.1 should be granted.

II. Bannum is Likely to Succeed on the Merits

A. The BOP Failed to Implement Proper or Reasonable Remedial Action

The BOP's "remedial action" was supposedly intended to remedy the prejudice to Bannum and other offerors from the BOP's improper award to Dismas without discussions. Thus, to be "remedial," discussions should have been structured to enable prejudiced offerors like Bannum to have a legitimate opportunity to compete.

Because almost six months that had passed since the July 2006 award, the BOP knew that Bannum and likely [redacted] That meant that to remedy the BOP's procurement error [redacted] a reasonable time would have to be given [redacted] However, the BOP had no intention of taking reasonable remedial action.

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

Here, the BOP provided 6 months to accomplish the [redacted] Yet, the BOP deliberately established an unreasonable schedule that gave offerors like Bannum and [redacted] less than 30 days, during the holidays, to respond. The BOP did not advise [redacted] that it could [redacted]. Indeed, [redacted] withdrew because [redacted] and [redacted] within the 11 days provided in the BOP's notice, during the holidays.

Likewise, the BOP's reaction when it received Bannum's notice that [redacted] was to eliminate Bannum even though Bannum stated [redacted] but would require more time.

While the BOP purported to understand that the situation was not "normal" and that [redacted], it only gave Bannum another 8 days to submit responses to discussions. Bannum believes this extension was actually intended to give Dismas and [redacted] time to correct their deficient [redacted] The 8 days was only reasonable for correcting the other offerors' deficiencies, not to enable Bannum to [redacted]

The BOP's intentional failure to provide a reasonable time for Bannum to compete on a level playing field was material and prejudicial. To avoid termination liability, the time frames were intended to give Dismas an unfair advantage [redacted] as a result of the BOP's improper award based on initial offers. The fact that [redacted] fortuitously had an available facility in Orlando does not deprive Bannum of its right, as a member of the competitive range, to fair and equal discussions to remedy the prejudice from BOP's procurement error.

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

In Beta Analytics v. United States, 69 Fed. Cl. 431 (2005), this Court recognized that a good faith remedial action must mitigate an unfair competitive advantage that resulted from an agency's procurement error. See also Textron, Inc. v. United States, 74 Fed. Cl. 277, 291-2 (2006) (recognizing this principle). GAO case law also supports this principle. Ford Aerospace Corporation et al, B-239676-.5, March 8, 1991, 91-1 CPD ¶260; Smith & Wesson, B-232681-.2, .3, Feb. 9, 1989, 89-1 CPD ¶134; Kaufman Lasman Associates, Inc., 68 Comp. Gen. 34 (October 21, 1988), B-229917, B- 229917.9, 88-2 CPD ¶381; Computer Sciences Corp., B-190632, Aug. 9, 1979, 79-2 CPD ¶102. This principle is directly applicable here.

B. Bannum Was Entitled to Additional Discussions

Bannum's elimination was in violation of the RFP, which [redacted] Since discussions were ongoing, it was implicit in the RFP that an opportunity to discuss any issues [redacted] would be provided. Further, even when discussions concluded, FPRs were yet to be issued, and would provide another opportunity to revise or modify offers. Yet, Bannum was erroneously and unreasonably deprived of any opportunity to resolve the issues the BOP identified.

An additional round of discussions was also required because any Bannum deficiencies were the fault of the BOP, due to BOP misevaluation, and a lack of meaningful discussions. As shown below, all of these alleged defects were easily correctable within reasonable due dates.

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

[redacted] Had the BOP provided Bannum with an estimated performance date, which the BOP had developed and should have disclosed, AR 4276, [redacted]

Bannum's [redacted] was acceptable. Nothing in the RFP requires [redacted] Such time was available since more than 2 weeks were given to the other offerors to submit FPRs.

While Bannum [redacted] in the unreasonable time allowed, in its January 8, 2007 response, Bannum had had not listed these documents. AR 4387. While the BOP listed deficiencies [redacted], no deficiencies were listed in [redacted] AR 4406-07. Had Bannum been so advised, Bannum would have provided [redacted] The BOP failed to conduct meaningful discussions.

**AGREED UPON REDACTED COPY
MAY BE MADE PUBLIC**

Bannum's January 26, 2007 offer contained all necessary [redacted] do not justify its elimination. In sum, all alleged defects could have been easily resolved within a reasonable time in further discussions and in the FPRs.

C. <u>The BOP Conducted Unequal, Inconsistent and Unfair Discussions</u>

1. [redacted] <u>Zoning was Deficient</u>

The zoning for [redacted] facility was conditioned on the requirement that the facility not house sex offenders or inmates with a history of violence. AR 2018.

In the first evaluation, the TEP correctly found this condition to be a <u>deficiency</u>. The RFP, §B.1 states that the contractor is <u>required</u>:

> "to provide CCC services to male and female Federal offenders <u>held under authority of various United States Statutes</u> located in the Orlando (Orange County), Florida area… The Government intends to refer <u>all eligible CCC requirements</u> under this solicitation to the successful contractor." (emphasis added). AR 6.

No exception exists for sex offenders or inmates with a history of violence. <u>See also</u> BOP's CCC Program Statement 7310.04. AR 1223-24.

The TEP initially recognized that this restriction was improper. AR 2381. However, apparently to be able to claim there were two "competing" offerors, late in the first evaluation process, an unidentified BOP reviewer, ignoring the TEP, the above RFP provision, and BOP policy, directed the elimination of this deficiency. AR 2473. While recognizing the defect in the reevaluation, the BOP improperly changed its zoning "deficiency" to a "clarification."

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

Changing labels does not change the fact that the BOP was seeking a revision to [redacted] proposal to eliminate an unacceptable and material restriction on which inmates could be assigned to the CCC, a violation of the RFP. Dubinsky at pp. 261-62 (rejecting label of "clarification"); cf. JWK International Corp. v. United States, 52 Fed. Cl. 650, 661 (2002)(requests for revision of a proposal is not a clarification).

Moreover, after first and second discussions, [redacted] proposal remained in direct violation of the RFP. Thus, the BOP had no reasonable basis to find [redacted] deficient zoning "acceptable." Further, by finding [redacted] the BOP performed this evaluation inconsistently and discussions were improper and unequal. Seattle; supra at p. 569; see also Orca Northwest Real Estate Services v. United States, 65 Fed. Cl. 1, 11 (2005).

The defect remained in [redacted] February 15, 2007 FPR. In the letter submitted, the City official merely said that Orlando's zoning laws did not prohibit housing sex offenders. While noting the City's October 4, 2005 letter which established the conditions, he did not address the stated conditions. AR 5290. Further, nothing in the letter addressed the prohibition on housing persons with a history of violence. BOP's acceptance was an improper relaxation of the RFP requirements. Alfa Laval Separation v. United States, 40 Fed. Cl. 215, 234 (1999), aff'd 175 F.3d 1365 (Fed. Cir. 1999).

2. The BOP Failed to Require Dismas to Address the [redacted] and [redacted]

In its initial protest, Bannum submitted evidence that the Edgewater North Commerce Park Association, Dismas' closest local concern, was strongly opposed to Dismas' CCC and that the Association considered this residential use to be prohibited by a private restrictive covenant on the property. AR 1226.

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

Bannum asserted that to avoid the consequences of this opposition and the private restrictive covenant, Dismas had [redacted] AR 857, 860. Further, Bannum asserted that prior to award, Dismas was told of this opposition but did not notify the BOP and was non-responsible. AR 3812.

This [redacted] constituted two violations of Attachment 9 which states the:

> "... offeror shall submit official documentation that demonstrates they have a right to use .... Acceptable evidence of a right to use is limited to deeds, leases, bills of sale, options to lease, options to buy, contingency leases, or contingency deeds." AR 119.

Dismas submitted materially <u>incomplete</u> evidence of [redacted]

Further, Attachment 9 requires that the:

> "... offeror shall submit a Local Area Concerns Within a Half-Mile Radius Attachment, identifying facilities whose closeness to the CCC may raise public concern. For those concerns identified, include your approach for mediating any potential community impacts in the space provided.
>
> The offeror shall provide a Community Relations Plan which describes their approach for educating and interacting with the local community in order to acquire and maintain public support.... Offeror shall ensure the Plan is relevant to the location required under this solicitation ..." AR 120.

In moving to dismiss based on the BOP's remedial action, Defendant argued that this issue of Dismas' responsibility and risks could not be resolved until discussions were concluded and was therefore premature. AR 4064. The BOP simply ignored this statement and did not ask Dismas any questions on these topics while assigning deficiencies to [redacted] for issues relating to [redacted]

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

This decision enabled Dismas to avoid explaining its improper actions. Bannum believes that Dismas should be disqualified for concealing these facts. Further, if asked, Bannum believes Dismas will not be able to advise the BOP that this opposition is resolved. This should result in downgrading of Dismas' ratings and risk assessments.

3. [redacted] Should Also Be Disqualified

[redacted] misrepresented to the BOP that it was a small business. The BOP ignored this misconduct and included [redacted] in the competitive range. In the re-evaluation, [redacted] apparently represented itself as a small business. Only in its FPR did [redacted] claim that a change in its situation now made it a large business.

The BOP is in possession of the total receipts for [redacted] BOP contracts and should know that [redacted] exceeded the size standard. Moreover, [redacted] initial offer included information showing that [redacted] President, was also President of [redacted] Thus, the companies were affiliated and the receipts of both companies are also combined. 13 CFR §121.103. The only change in "situation" that caused [redacted] to admit it is a large business on February 15, 2007 was that someone apparently had warned [redacted] that its continuing misrepresentations would place it in jeopardy. The BOP knew or hid itself from the fact that [redacted] had misrepresented its size. Bannum believes this was done to create the existence of "competition" under its time frames to facilitate its elimination of Bannum. [redacted] should be disqualified.

D. Bannum Has Been the Victim of Improper BOP Retaliation

As documented herein and in prior pleadings in the AR, since the beginning of this procurement, Bannum has been subjected to continuous BOP attempts to eliminate it or at a minimum, to improperly harm its chances to win this contract.

**AGREED UPON REDACTED COPY MAY BE MADE PUBLIC**

When the small business restriction was removed, Bannum was given inadequate time to submit its initial offer. When Bannum was improperly eliminated for [redacted] the BOP "reinstated" Bannum knowing that it had already decided to make an award to Dismas, admittedly an improper act. The BOP then shut down Bannum's incumbent contract and transferred the inmates to [redacted] facility which could not handle them, willingly disrupting the inmates' CCC services and jobs and violating BOP policy. This reckless action was taken so that Bannum would earn no income from its incumbent contract during the expected GAO protest period and to rid itself of Bannum.

After Bannum filed the first protest in this Court, and was able to obtain parts of the AR that the BOP had improperly withheld at the GAO, the BOP realized its evaluation errors were indefensible. The BOP took "remedial action" but like all its other actions, it was designed to with unreasonable deadlines to prejudice Bannum.

All these BOP actions and its most recent elimination are acts of retaliation against Bannum for filing grievances against BOP personnel and valid protests against improper BOP procurement actions. Such retaliatory actions must be stopped.[2]

E. Bannum Has Established Competitive Prejudice

If reasonable discussions were held, Bannum's FPR will be fully compliant, and the [redacted] AR 5211-12. [redacted] offer remains unacceptable but a comparison of Bannum's evaluated strengths to shows that Bannum [redacted]. AR 4857-63, 5182-87. Bannum has a substantial chance to win the contract.

---

2 [redacted]

**AGREED UPON REDACTED COPY MAY BE MADE PUBLIC**

III. Injunctive Relief is Appropriate

Bannum will suffer the irreparable harm in the loss of profits in a contract Bannum has a substantial chance to win. See Norfolk Dredging, Co. Inc. v. United States, 58 Fed. Cl. 167, 184-85 (2003). AR 3039-41. The harm to the other parties is non-existent since the remedy— renewed discussions and a fair evaluation which mitigates unfair competitive advantages is the full and fair competition to which they are entitled.

Further, the public interest in proper procurements weighs strongly in favor of Bannum. Accordingly, the balance of harms strongly favors the granting of Bannum's request for preliminary and permanent injunctive relief.

CONCLUSION AND REQUEST FOR RELIEF

Remedial action following an agency procurement error must mitigate the harm caused to the parties that have been prejudiced. The BOP had no intention of taking legitimate remedial action that would enable Bannum, a prejudiced party with the best chance to win, to fairly compete for this contract.

The BOP personnel who participated in this most recent unreasonable decision not to mitigate the harm caused by BOP procurement errors and its conduct of unfair and unequal discussions must be stopped.

For these reasons and those stated in its pleadings in this and the prior case, Bannum respectfully requests that this Court grant Plaintiff's Motion for Summary Judgment on the Administrative Record and enjoin the BOP from making an award until discussions are reopened inclusive of Bannum, with reasonable time frames for submissions.

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

Bannum further respectfully requests that this Court enjoin persons in the BOP who have been involved in this procurement and order the procurement to be handled by independent persons in the Department of Justice.

Respectfully submitted,

Michael A. Gordon
s/ Michael A. Gordon
Counsel of Record for Bannum, Inc.
HOLMES & GORDON
17 West Jefferson Street
Rockville, Maryland 20850
(301) 340-1251
(301) 340-1253 (facsimile)

OF COUNSEL:
Fran Baskin, Esquire
HOLMES & GORDON
17 West Jefferson Street
Rockville, Maryland 20850
(301) 340-1251
(301) 340-1253 (facsimile)