# In The United States Court of Federal Claims

No. 07-109C

**This Opinion Will Not Be Published in the U.S. Court of Federal Claims Reporter Because It Does Not Add Significantly to the Body of Law.**

(Filed Under Seal: April 20, 2007)

(Reissued: May 21, 2007)[1]

_____

|  |  |
|---|---|
| BANNUM, INC., | * |
|  | * |
| Plaintiff, | * |
| v. | * |
|  | * |
| THE UNITED STATES, | * |
|  | * |
| Defendant, | * |
|  | * |
| And | * |
|  | * |
| DISMAS CHARITIES, INC., | * |
|  | * |
| Defendant-Intervenor. | * |

_____

**OPINION**

_____

This post-award bid protest case was filed by Bannum, Inc. (Bannum or plaintiff), regarding a contract for a Community Corrections Center (CCC) in Orlando, Florida. Owing to the need to resolve this matter expeditiously, this opinion is necessarily brief.

On November 30, 2005, the Federal Bureau of Prisons (BOP) released RFP No. 200-0880-SE in search of a contractor offering a facility suitable for housing prison inmates in a

_____

[1] An unredacted version of this opinion was issued under seal on April 20, 2007. The opinion reissued today incorporates defendant's unopposed proposed redactions, as well as some minor typographical changes. The redacted material is represented by brackets [ ]. While plaintiff proposed an additional redaction, the court believes that the information involved is neither protected nor privileged.

scheduled work-release program in Orlando, Florida.  The RFP indicated that sealed offers should be submitted by January 30, 2006, and that contract performance was to begin within 120 days from the date of award.  The technical/management portion of the RFP required offerors to submit, *inter alia*, proof of their right to use the facility, proof that they had notified local law enforcement and at least two levels of local government officials of their intent to open and operate a CCC, evidence of community support or acknowledgment for the location of the proposed site, and an approval or plan to obtain zoning and/or an occupancy permit for the proposed location.  In addition, the RFP required each offeror to provide a copy of architectural floor plans, site plans, and color photographs of the proposed facility.  The RFP anticipated that an offeror might seek to change its facility during the course of the procurement, stating –

> Only one request for a change in an offeror's proposed facility will be approved by the Contracting Officer.  This request must be received by the Contracting Officer prior to offerors being given an opportunity to submit final proposal revisions.  All requests for a site change must include all site information required herein.

The same clause further indicated that "[a]ny proposed change following submission of initial proposals will be considered an unsolicited proposal modification which may result in elimination from the competitive range."

Section M of the RFP indicated that one of the factors on which the offeror's technical and management proposal would be evaluated was "Site Location," consisting of two subfactors – "Site Validity and Suitability" and "Community Relations Program."  Regarding the first of these subfactors, the RFP stated that "[t]he Site Validity and Suitability subfactor evaluates the proposed site location and considers the validity of the offeror's right to use and zoning approval."  As to the second of these subfactors, the RFP required offerors to "submit documentation to evidence community support or acknowledgment for the location of the proposed site (*e.g.*, letters of affirmation from public officials, minutes of community relations board meetings that indicate community support or acknowledgment for the proposed site, petitions of support, etc.)."  BOP reserved the right to award the contract on the basis of original offers, even if a deficiency was found in a submitted bid, and advised offerors to "consider each proposal as a final proposal revision offer unless otherwise instructed by the Contracting Officer."  At the same time, BOP reserved the right to conduct discussions with offerors if the contracting officer determined them necessary.  In the event such discussions occurred, the offerors were required to submit "valid proof of all zoning and local ordinance requirements necessary for the operation" of a CCC within sixty days of the initial proposal.

BOP received proposals from Dismas Charities, Inc. (Dismas), Bannum, [ ], and [ ].  On June 28, 2006, Bannum submitted a new, unsolicited proposal to BOP, in which it proposed an alternate facility, including therein all new floor and site plans, proof of zoning, public concern matrices, color photographs, and a revised pricing schedule.  However, because this proposal was

unsolicited, BOP instead based its evaluation on Bannum's initial proposal.  On July 5, 2006, BOP awarded the contract to Dismas.

On July 14, 2006, Bannum protested the award to the General Accountability Office (GAO).  After that protest was denied, on November 1, 2006, Bannum filed a protest action in this court.  On December 12, 2006, BOP reopened the procurement process, with the intent of taking voluntary corrective action by conducting discussions with each offeror.  On December 13, 2006, after being notified about these discussions, Bannum contacted BOP to inquire whether Bannum's June 28, 2006, submission would be considered during the phase of corrective action.  In these communications, Bannum did not disclose that the leases on the property disclosed in its original submission, as well as on the property disclosed in its June 25, 2006, submission, had both expired.  On December 20, 2006, after the court had been notified of BOP's corrective action, Bannum's protest action was dismissed.  On December 27, 2006, BOP notified Bannum that its original TMP, dated February 26, 2006, would be reevaluated.  On December 28, 2006, BOP sent discussion notices – based on original proposals – to all four offerors.  BOP noted that Bannum's contingent lease on the original property appeared to have expired on September 1, 2006, and asked Bannum to resubmit proof of its right to use the property.

On January 4, 2007, [ ] withdrew from the procurement, indicating that it had been unable to obtain a new facility.  On January 8, 2007, Bannum timely responded to the discussion notice, but failed to include a description of a proposed site location.  As of that date, Bannum had not yet executed a right to use on a new facility.  Nonetheless, Bannum represented to BOP that it would submit all of the required documentation pertaining to a new site as soon as it received a right to use the property, which it anticipated receiving "in a matter of days."  Despite this deficiency in Bannum's response, the contracting officer determined that "given the extended period between the award and the re-evaluation," it was "appropriate to allow Bannum's proposal to remain under consideration and for Bannum to be able to respond to a second round of discussions."

On January 18, 2007, all offerors were sent a second round of discussion questions, stemming from a new BOP amendment to the RFP that was issued on December 27, 2006.  This amendment required offerors to submit a copy of their proposed location's architectural floor plans, site plans, and photographs within 120 days of proposal submission.  The amendment further required offerors to submit a plan for complying with the "120-day availability requirement," which required the offeror to begin housing inmates within 120 days of the contract award.  All offerors were required to respond to the new amendment by January 26, 2007, and Bannum was additionally required to respond to the series of deficiencies relating to its failure to propose a site location in the first round of discussions.

On January 26, 2007, Bannum responded to the second round of discussions, representing that it had located a facility that was properly zoned, and attached as evidence of its right to use a contingent lease that was signed by the owner, but, critically, not by Bannum.  The lease included a clause entitling the landlord to retain the security deposit of $13,902.51, even if BOP did not

award the contract to Bannum.  In an attempt to meet the proof of zoning requirement, Bannum included in its submission an affidavit from its realtor, which stated that a City of Orlando zoning official had agreed that zoning was proper for the location but that at least two more weeks would be required to send a letter.  Bannum's response also included a new 120-day availability plan, floor plans, site plans, and an environmental checklist.  Bannum did not, however, submit any or facility photographs, stating instead that it would submit the photographs, as well as a professionally-prepared site plan, "shortly."  The latter materials were sent to BOP via e-mail on January 31, 2007, and supplied in hard copy on February 5, 2007.

On February 6, 2007, Dismas and [ ] were notified that their respective responses to the second discussion notice were adequate and that they should submit final proposed revisions no later than February 16, 2007.  Bannum, however, was notified that it had been eliminated from the competitive range.  The contracting officer explained, by letter, and in an enumerated list, Bannum's deficiencies in response to both rounds of discussion, indicating that Bannum's proposal failed to contain: (i) a right to use the facility signed by both parties; (ii) zoning approval, as well as valid proof of all zoning and local ordinance requirements necessary for the operation of a CCC; (iii) evidence of community support or acknowledgment for the location of the proposed site; and (iv) photographs and a site plan.  The letter concluded that "[n]o further revisions to Bannum's proposal shall be accepted or considered."

On February 15, 2007, Bannum filed a second protest action in this court.  On March 6, 2007, Bannum filed its motion for judgment on the administrative record.[2]  Defendant and intervenor-defendant filed their cross-motions for judgment on the administrative record on March 14, 2007.  Oral argument was conducted on March 30, 2007.  Bannum alleges that the BOP purported to take "remedial action" by engaging in discussions with Bannum and other potential offerors, but that ultimately this remedial action was a sham, and designed to re-award the contract to Dismas.

Over the last several years, the Federal Circuit has definitively addressed the requirements for standing in bid protest actions.  In *Am. Fed'n of Gov't Employees, AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001), *cert. denied*, 534 U.S. 1113 (2002), it held that the term "interested party," as used in 28 U.S.C. § 1491(b)(1), should be construed in accordance with the Competition in Contracting Act (CICA), 31 U.S.C. §§ 3551-56 (2000).  *See also Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006).  Under this approach, the term "interested party" is limited to "'actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract.'"  *Am. Fed'n*

---

[2] Plaintiff's motion was improperly captioned as "Plaintiff's Motion for Summary Judgment on the Administrative Record," but properly cited RCFC 52.1.  The court will treat it as a motion for judgment on the administrative record.  *See*, *e.g.*, *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354-57 (Fed. Cir. 2005) (referring to RCFC 56.1, which is the antecedent to current RCFC 52.1); *Int'l Outsourcing Servs., L.L.C. v. United States*, 69 Fed. Cl. 40, 45-47 (2005) (same).

*of Gov't Employees*, 258 F.3d at 1302 (quoting 31 U.S.C. § 3551(2)); *see also Banknote Corp. of America, Inc. v. United States*, 365 F.3d 1345, 1352 (Fed. Cir. 2004). Subsequently, in *Myers Investigative and Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002), the Federal Circuit illuminated what it meant by a "direct economic interest," stating that, to meet this requirement, "a potential bidder must establish that it had a substantial chance of securing the award in order to establish standing." *See also Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) ("prejudice (or injury) is a necessary element of standing"); *North Car. Div. of Services for Blind v. United States*, 53 Fed. Cl. 147, 161 (2002), *aff'd*, 60 Fed. Appx. 826 (Fed. Cir. 2003).

      This court has held that "[a] bidder submitting a nonresponsive bid has no standing to protest an award, because it has no chance of receiving the award." *A & D Fire Protection, Inc. v. United States*, 72 Fed. Cl. 126, 138 (2006); *see also CHE Consulting, Inc. v. United States*, 47 Fed. Cl. 331, 337 (2000) ("A nonresponsive bidder is not an interested party."); *Ryan Co. v. United States*, 43 Fed. Cl. 646, 657 (1999) ("the phrase 'interested party,' as used in 28 U.S.C. § 1491(b), does not include a bidder . . . determined to be nonresponsive, whose only chance of winning a contract is in a resolicitation").[3] "Although responsiveness is generally used to describe sealed bids," this court has recently stated, "the same concept applies to final offers submitted after negotiations." *Dismas Charities, Inc. v. United States*, 75 Fed. Cl. 59, 61 (2007). Accordingly, a proposal that does not conform to the solicitation requirements is technically unacceptable and cannot be considered for award unless the agency reopens negotiations for all offerors or modifies the solicitation. *See* 48 C.F.R.§ 15.306(b); *see also Dismas Charities*, 75 Fed. Cl. at 61.

      In the case *sub judice*, it is undisputed that plaintiff's submission did not comply with several requirements of the RFP. The most significant deficiency in its submission was its failure to provide proof of the right to use a facility, the importance of which was emphasized in multiple provisions in the RFP. In particular, the requirements for "Site Validity and Suitability" specifically required that the offeror provide "official documentation that demonstrates that the offerors have a right to use, signed by both parties, and an approval or plan to obtain zoning and/or an occupancy permit for their proposed site location," adding that acceptable evidence of a right to use was "limited to deeds, leases, bills of sale, options to lease, options to buy, contingency leases, or contingency deeds." Here, plaintiff indicated on January 8, 2007, that it anticipated executing a lease in a "few days," and was allowed additional time by the BOP to produce a compliant facility. Yet, when time ran out and plaintiff filed its revised proposal on January 26, 2007, it included therein only a lease that it had not signed. Moreover, it neither provided any indication of community support nor photographs of the facility – all required by the RFP. It was based upon these various deficiencies that the BOP, on February 6, 2007, eliminated Bannum from consideration.

---

    [3] *See also United States v. IBM Corp.*, 892 F.2d 1006, 1010-13 (Fed. Cir. 1989) (addressing a similar issue under the now-repealed Brooks Act); *MCI Telecommunications Corp. v. United States*, 878 F.2d 362 (Fed. Cir. 1989) (same).

Under this court's bid protest jurisdiction, agency determinations that a proposal is nonresponsive or noncompliant are subject to arbitrary and capricious review. *See* 28 U.S.C. § 1491(b)(4) (incorporating the standard found in 5 U.S.C. § 706(2)(A)); *see also Labs. Supply Corp. of America v. United States*, 4 Cl. Ct. 136, 139 (1983).[4] Contrary to plaintiff's claims, there is no indication that the agency acted in an arbitrary and capricious fashion in determining that Bannum's bid was noncompliant. This is certainly true insofar as the decision was based on Bannum's failure to provide proof of the right to use a facility. Indeed, while plaintiff asserts that it was afforded inadequate time within which to obtain a facility, it appears that: (i) nothing prohibited plaintiff from making arrangements to have a facility ready and available in the event it prevailed on its earlier protest;[5] and (ii) plaintiff would have met the requirement for providing proof of the right to use the facility had it simply been willing to make the $13,902.51 nonrefundable deposit required by the lessor. Certainly, BOP is not responsible for plaintiff's nonfeasance on either of these counts.[6] Moreover, nothing in the record suggests that Bannum could not have leased a compliant facility between December 12, 2006, when it was notified that corrective action would occur, and January 26, 2007, when, after extensions granted by the agency, it was required to provide proof of the right to use a facility. Nor is there any significant evidence supporting plaintiff's claim that the agency's determination was made in bad faith, let alone the clear and convincing evidence of a specific intent to injure needed to support such an assertion. *See Textron, Inc. v. United States*, 74 Fed. Cl. 277, 293 (2006); *EP Prods., Inc. v. United States*, 63 Fed. Cl. 220, 226 & n.12 (2005); *Bannum, Inc. v. United States*, 56 Fed. Cl. 453, 457-58 (2003). Indeed, if anything, the administrative record instead suggests that BOP could have rightfully eliminated Bannum earlier in the competition, but instead granted plaintiff various extensions.

Accordingly, there is no basis to disturb the agency's finding that Bannum's proposal was noncompliant. As a result, plaintiff "did not have a substantial chance of contract award and

---

[4] By its very definition, this standard recognizes the possibility of a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which "consider[s] the relevant factors" and is "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983)*; see also Banknote Corp. of America*, 365 F.3d at 1350-52; *Software Testing Solutions, Inc. v. United States*, 58 Fed. Cl. 533, 538 (2002); *Gulf Group, Inc. v. United States*, 56 Fed. Cl. 391, 396-98 (2003).

[5] Indeed, plaintiff does not explain what it would have done has this court entered an injunction in the earlier bid protest case, given that its leases on various facilities had lapsed prior to the time that first suit was initiated.

[6] Contrary to plaintiff's claims, this is not the case, like *Beta Analytics v. United States*, 69 Fed. Cl. 431, 433-35 (2005), in which the earlier award to Dismas directly prejudiced plaintiff's ability to maintain, during the period that its various protests were pending, the right to use a qualifying facility. *See also Textron, Inc.*, 74 Fed. Cl. at 291.

cannot be an 'interested party' for purposes of this Court's bid protest jurisdiction." *Dismas Charities*, 75 Fed. Cl. at 62. Given this, plaintiff is in no position either to challenge the compliance of Dismas' bid with the solicitation or raise other issues concerning the handling of its prior proposals, *e.g.*, whether it received adequate discussions. *See*, *e.g.*, *A & D Fire Protection*, 72 Fed. Cl. at 140; *CHE Consulting*, 47 Fed. Cl. at 337; 48 C.F.R. §§ 15.306(c)(3), 15.306(d)(5) (noting that discussions need not be completed for an offeror which has fallen out of the competitive range). Simply put, it is not for this court to correct problems that had no effect whatsoever on Bannum's chances of winning the contract in question. *See*, *e.g.*, *Ryan*, 43 Fed. Cl. at 658; *Fortran Corp. v. Dept. of Transp.*, 95-1 BCA ¶ 27,350 (1994); *cf. Essex Electro Engineers, Inc. v. United States*, 3 Cl. Ct. 277, 280, 286-87 (1983).

This court will not paint the lily. Having considered and rejected plaintiff's other claims, and for the reasons described above, it holds that it lacks jurisdiction over plaintiff's complaint under 28 U.S.C. § 1491(b). Accordingly, plaintiff's motion for judgment on the administrative record is **DENIED** and defendant's and defendant-intervenor's cross-motions for judgment on the administrative record are hereby **GRANTED**. The Clerk is directed to dismiss the complaint.[7]

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

---

[7] This opinion shall be unsealed, as issued, after May 20, 2007, unless the parties identify protected and/or privileged materials subject to redaction prior to said date. Said materials shall be identified with specificity, both in terms of the language to be redacted and the reasons for that redaction.